JD:TAW/DJL
F. #2017R00702

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

        - against -

HAFEEZ ALI and
MOHAMMAD AKHTAR,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**To Be Filed Under Seal**

AFFIDAVIT AND COMPLAINT IN SUPPORT OF APPLICATION FOR ARREST WARRANT

(18 U.S.C. § 1029(b)(2))

19-M-583

EASTERN DISTRICT OF NEW YORK, SS:

    WILLIAM DUFFIN, being duly sworn, deposes and states that he is a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations, duly appointed according to law and acting as such.

    In and between March 2015 and June 2017, within the Eastern District of New York and elsewhere, the defendants HAFEEZ ALI and MOHAMMAD AKHTAR, together with others, did knowingly and with intent to defraud did traffic in and use one or more unauthorized access devices, in a manner affecting interstate commerce, and by such conduct did obtain something of value during any one year period, the aggregated value of which is equal to or greater than $1,000.

    (Title 18, United States Code, Section 1029(b)(2))

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"). I am currently assigned to the El Dorado Task Force ("Task Force"), a multi-agency federal and state task force investigating financial crimes. My duties include conducting and assisting in investigations into various financial frauds including access device fraud and identity theft. I have participated in numerous investigations involving financial frauds, during the course of which I have interviewed suspects and witnesses, executed court-authorized search and arrest warrants and used other investigative techniques to secure relevant information, including the examination of computers and other electronic devices. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to carry out their activities. I am familiar with the facts and circumstances set forth below from my participation in the investigation, discussions with other law enforcement officials, my review of documents and my training and experience. Statements attributable to individuals herein are set forth in sum and substance. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

3

2. During the course of my work as an agent, I have been involved in investigations of what are commonly referred to as credit card bust-out schemes and synthetic identity fraud schemes.

3. In a credit card bust-out scheme, individuals possessing counterfeit or unauthorized credit cards typically take their credit cards to collusive merchants who make fraudulent charges on these cards. These fraudulent charges include, but are not limited to, charges that purport to be for merchandise or services, but for which no actual merchandise or services are exchanged, and charges for which the collusive merchants and credit card holders know the card issuer will never be paid. Frequently, the collusive merchant is paid a fee by the credit card holder, often a percentage of the value of the fraudulent charges, for the fraudulent use of the credit cards. Collusive merchants typically keep between 10 and 25 percent of the amount of the charge. In order to pay the cardholder his share, the collusive merchant must pay by check from the collusive bank account or withdraw cash, which is preferable to the cardholder because there is no paper trial. However, frequent cash withdrawals raise the awareness of banks, so it is not uncommon for co-conspirators to use both methods.

4. In a synthetic identity fraud scheme, the perpetrators of the scheme will typically open bank and credit card accounts in the names of one or more other individuals. The putative account holders are not real people. Rather, the perpetrators combine various pieces of personal identifier information (e.g., names, dates of birth, addresses and Social Security numbers) from different individuals, either real or fictitious, to create a fictitious synthetic identity that appears, for all intents and purposes, to represent a real person but, in reality, does not. The perpetrators typically open various types of accounts at different

Case 1:19-mj-00583-LB Document 1 Filed 06/25/19 Page 4 of 9 PageID #: 4

4

financial institutions for a given synthetic identity using the same synthetically-combined personal identifier information. Possession and use of a stable of synthetic identities frequently permits fraud perpetrators to commit a substantial number of credit card bust-out frauds.

5. In addition to direct fraudulent transactions with financial institutions, perpetrators of line of credit fraud, credit card bust-out schemes and synthetic identity fraud frequently create and/or control shell companies (which have little or no legitimate business purpose) from which seemingly legitimate purchases of goods or services are made or to which charges from fraudulent credit or debit cards are sent. Shell companies are also frequently used to write checks to artificially inflate the credit limit for a credit card account, make fraudulent deposits into checking accounts, or make fraudulent repayments on line of credit accounts. Investigating agents frequently discover that a company is a shell company with no legitimate business purpose through a number of methods. For example, investigating agents may determine that the address purportedly used to conduct business is either fictitious or that there is no apparent business activity being transacted there that matches the ostensible business purpose of the firm. A review of bank accounts and other financial statements for the company may reveal that there are no apparent legitimate business income or business expenses, such as payroll, expenses or cost of goods. Additionally, investigating agents may identify fraudulent bank and credit card accounts used for line of credit fraud or credit card bust-outs and discover from financial records that a company with no apparent legitimate business purpose is receiving a high volume of transactions-including debit card and credit card transactions-from these fraudulent accounts,

indicating that one of the primary purposes of the company is to facilitate the use of such fraudulent accounts.

## SUMMARY

6. As set forth below, the defendants' HAFEEZ ALI and MOHAMMAD AKHTAR are cousins whose conduct involved the use of synthetic identities to engage in schemes resulting in credit card bust outs and financial loss to credit card issuers. The defendants HAFEEZ ALI and MOHAMMAD AKHTAR engaged in these schemes together and separately.

7. The defendants HAFEEZ ALI and MOHAMMAD AKHTAR conspired to obtain several credit cards in the name of the synthetic identity "Irfan Khan." MOHAMMAD AKHTAR's home address was used for the synthetic identity and HAFEEZ ALI was listed as an authorized user on three of those credit cards busted out in the name of "Irfan Khan." Nine credit cards were fraudulently obtained in the fictitious name of "Irfan Khan," each of which was busted out, resulting in financial losses.

8. MOHAMMAD AKHTAR is employed as a manager at an auto repair shop in Long Island City, Queens, New York. There are two auto repair shops operating at that same location, both owned by the same individual. Those two auto repair shops received at least 14 credit card charges from busted out credit cards in the names of synthetic identities, including "Irfan Khan," in the amount of $25,074. The credit cards used for these charges are controlled by MOHAMMAD AKHTAR and/or HAFEEZ ALI.

9. MOHAMMAD AKHTAR and HAFEEZ ALI also used the fraudulent credit cards to pay for personal items such as furniture for MOHAMMAD AKHTAR in the

amount of $4,142, as well as a down payment for a vehicle for HAFEEZ ALI, in the amount of $4, 500.

10. With respect to another synthetic identity, "Zahid Anwar," Santander Bank surveillance photographs captured MOHAMMAD AKHTAR conducting transactions with respect to this identity on December 14, 2016 and January 24, 2017.

11. Similarly, on January 20, 2017 and January 23, 2017, TD Bank surveillance photographs captured MOHAMMAD AKHTAR conducting transactions for the "Zahid Anwar" synthetic identity.

**PROBABLE CAUSE TO ARREST THE DEFENDANTS**

12. The defendants MOHAMMAD AKHTAR and HAFEEZ ALI used synthetic identities to further their scheme of using busted out credit cards to incur charges for goods and services, while having no intention to pay those debts.

### A. Joint Conduct Between the Defendants MOHAMMAD AKHTAR and HAFEEZ ALI

13. The defendants coordinated to bust out nine credit card accounts in the name of synthetic identity, "Irfan Khan."

14. Bank records reveal that MOHAMMAD AKHTAR's home address was used for this synthetic identity. Additionally, on the applications for two of the nine credit cards applied for by "Irfan Khan," HAFEEZ ALI is listed as an "authorized user" of those credit cards.

15. From approximately August 8, 2014 to September 10, 2016, fraudulent charges were made on these nine credit cards, each of which was busted out, resulting in financial losses to the credit card issuers exceeding $90,000.

16. As stated above, MOHAMMAD AKHTAR is employed as a manager of an auto repair shop located in Long Island City, Queens, New York. There are two auto repair shops located at the address of his employment. Both auto repairs shops are owned by the same person.

17. From May 28, 2014 to January 30, 2017, at least 14 fraudulent charges were made to these auto repair shops in the names of synthetic identities which were busted out by the defendants MOHAMMAD AKHTAR and/or HAFEEZ ALI. The synthetic identity "Irfan Khan" was one of the synthetic identities that paid these auto repair shops. For each of the synthetic identities that paid the auto repair shops, the home address of MOHAMMAD AKHTAR or HAFEEZ ALI was used to apply for and/or receive account statements for the credit card. These credit card charges totaled about $25,000, resulting in financial losses to the credit card issuers.

**B. HAFEEZ ALI's Conduct**

18. On July 10, 2015, a busted out credit card in the name of synthetic identity "Ali Hafeez," made a charge to Bay Ridge Toyota in the amount of $4,500, as a down payment for a vehicle. The vehicle was leased by the defendant, HAFEEZ ALI. In my training and experience, "Ali Hafeez," is a synthetic identity because the busted out accounts in that name contain a different social security number and date of birth from the defendant, HAFEEZ ALI.

19. Credit cards in the names of synthetic identities, which have used HAFEEZ ALI's address and have been busted out, have resulted in losses exceeding $150,000 to the credit card issuers.

8

20. For example, From December 4, 2014 to February 9, 2016, nine credit cards in the name of synthetic identity "Ali Hafeez," were active and used for charges exceeding $131,000. Each of these nine credit cards was busted out resulting in loses to the credit card issuers. Over 20 charges have been made on credit cards in the names of synthetic identities using the defendant HAFEEZ ALI's home address to shell companies controlled by HAFEEZ ALI's co-conspirator.

21. Approximately between November 2015 and December 2015, two checks totaling $13,260 were written from shell company accounts controlled by the defendant HAFEEZ ALI's co-conspirator to HAFEEZ ALI. In my training and experience, it is common practice for the controller of a shell company or a collusive merchant to pay back the card holder who controls the synthetic identity.

**C. MOHAMMAD AKHTAR's Conduct**

22. Similar to his co-defendant HAFEEZ ALI, MOHAMMAD AKHTAR has also been caught by bank surveillance photographs conducting transactions in the name of synthetic identities.

23. Santander Bank and TD Bank surveillance photographs previously captured MOHAMMAD AKHTAR engaging in transactions for bank accounts in the name of "Zahid Anwar." At least six credit card accounts were opened in the name of this synthetic identity. Bank records reveal that the "Zahid Anwar," used MOHAMMAD AKHTAR's home address. From January 9, 2016 to January 30, 2017, charges were made on these six credit cards which were busted out resulting in losses exceeding $150,000 to credit card issuers. One of these charges on a chase credit card in the name of "Zahid Anwar"

was made on January 25, 2017 in the amount of $4,142.64 to Raymour and Flanigan for furniture sold to the defendant MOHAMMAD AKHTAR.

24.  Credit cards in the names of synthetic identities which have used the defendant, MOHAMMAD AKHTAR's address and have been busted out in losses exceeding $300,000 to issuers.

WHEREFORE, your deponent respectfully requests that the defendants HAFEEZ ALI and MOHAMMAD AKHTAR be dealt with according to law.

_____
WILLIAM DUFFIN
Special Agent, United States Department of
Homeland Security, Homeland Security
Investigations

Sworn to before me this
25th day of June, 2019

_____
THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK